# A. L. REED v. STATE.

No. A-2533.    Opinion Filed May 31, 1918.

Rehearing Denied September 24, 1918.

(174 Pac. 800.)

1.    **APPEAL AND ERROR—Discretion of Court—Continuance.** Motions for continuance in a criminal case are addressed to the sound discretion of the trial court, and unless an abuse of discretion is manifest this court will not reverse the judgment for refusal to grant the same.

2.    **CONTINUANCE—Want of Preparation.** A murder was alleged to have been committed on November 24, 1914, and the defendant was arrested the same day; his preliminary examination was on December 7th, the information was filed in the district court December 21st; he was arraigned and pleaded not guilty on February 6, 1915; then the case was set for trial March 2d. On February 22d defendant's attorney caused subpoenas to issue for 22 witnesses; three days before the case was called for trial defendant's attorney left the county, and on March 1st notified the court that he was ill and unable to appear; thereupon the court appointed counsel to conduct the defense, who filed motion for continuance on the ground that he had not sufficient time to prepare the case for trial. **Held,** that there was no abuse of discretion in overruling the motions for a continuance.

3.    **HOMICIDE — Evidence — Self-Serving Declarations —Insanity.** Upon a question of the insanity of a defendant charged with murder, evidence of his acts, conduct and declarations so far as they relate to, are connected with, or illustrate, or afford material evidence of, his mental condition at the time of the homicide, is admissible; and written communications, as well as oral conversations, tending to show his insanity are admissible; but there must be a reasonable discretion in a trial court to restrict such evidence, and to exclude it when it is not entitled to any logical effect upon the question of his mental condition at the time of committing the act charged. However, a defendant cannot make substantive evidence in his own favor by proving self-serving declarations or written statements out of court, under the claim that the same would afford ground for argument that he was insane, and thus make his defense of insanity, without being subjected to cross-examination as a witness in his own behalf.

4. **APPEAL AND ERROR—Objection and Exception—Argument of County Attorney—Record.** Where error is assigned on the ground of alleged misconduct of the county attorney in his argument to the jury, the attention of the court should be called to the language used by proper objection, and a ruling had thereon by the court, and exception thereto reserved. The question will then be reviewed, or if the court settles and signs a bill of exceptions, showing the alleged misconduct, the question will be reviewed; but where, as in this case, the objection made and exception taken are not shown in the record, or by the bill of exceptions settled and signed, the question is not properly presented for review.

5. **HOMICIDE—Murder—Sufficiency of Evidence.** In a prosecution for murder, the evidence examined, and **held** sufficient to support the conviction without the death penalty, and that no prejudicial error was committed on the trial.

*Appeal from District Court, Cleveland County;*
*F. B. Swank, Judge.*

A. L. (Laney) Reed was convicted of murder, and he appeals. Affirmed.

The information charged that on the 24th day of November, in Cleveland county, Laney Reed did then and there kill and murder one William W. Bumgarner, by shooting him with a pistol. It appears that the deceased removed from Arkansas with his family in 1890, and settled in Cleveland county, near Denver. In 1902, the defendant, with his mother, a brother, and two sisters, removed from Arkansas to Cleveland county and settled in the same neighborhood. Their relations were friendly until a few years before the homicide here charged. The deceased had sold his farm a few weeks before his death, and was living at Norman, and was engaged in the collection business. It was his habit to go to public sales about over the county, where he might meet men against whom he had accounts and notes for collection; and on the fatal day he was attending a sale at the Champeau farm. The

defendant at that time was living at Edmond. His brother, Dr. Reed, lived at Henderson, Cleveland county. The defendant appeared at the Champeau farm about the time the sale was closing. He watered his horse, put him in a stall, fed him, and then walked out into the crowd. The deceased, whose horse was tied to a wagon in the lot, had unhitched his horse and had the bridle rein upon his arm, with a halter in his hand to put on a horse he had purchased there. The defendant approached and said, "Bumgarner"; as the deceased turned, the defendant shot him three times with an automatic pistol. Bumgarner fell and said, "Don't shoot any more; you have killed me." The defendant stepped up and fired three or four more shots at and into the body of the deceased. Several of those present picked up Mr. Bumgarner and carried him to the house. When they reached the house he was dead. The deceased was unarmed.

The sole defense interposed was that of insanity. A large number of witnesses testified to intimate acquaintance with the defendant for several years, and that his character for peace and quiet was good, and that for a year or so preceding the homicide he seemed to be moody. The mother, sisters, and brother of the defendant testified to acts, conduct, and declarations of the defendant during the year preceding the homicide, and giving as their opinion that he was not a person of sound mind. Dr. A. K. West, professor of medicine in the State University at Norman, qualified and testified as an expert alienist. The hypothetical question on his examination in chief fully and favorably states the facts relied upon to sustain the defense, and is as follows:

"Q. Doctor, assuming that the defendant is 35 years old, was born in Arkansas in 1879, and was reared and

raised on a farm there; that in his earlier manhood his father died, leaving a surviving widow, the mother of the defendant, and two brothers, one older and one younger than the defendant, and three sisters; that after the death of the defendant's father he and his older brother lived with the family upon the farm, managed and looked after the business, cared for the family up until 1901 or 1902; that during all this time the defendant was industrious, steady, quiet, thrifty, attentive, and considerate of his mother and his sisters, and their welfare, kind, pleasant, and agreeable to them, pleasant, courteous, and agreeable to his friends and associates and acquaintances; that he was cheerful, good-natured, was a lover of home, was only away except upon business; that in 1901 or 1902 the defendant and his family, including his mother and sisters, moved to Cleveland county, Oklahoma, and located upon a farm in the eastern part of this county; that he and his mother and sisters and the older brother lived together on the farm until some time in 1911 or 1912; that during all this time he was industrious, quiet, and steady, thrifty, attentive to business, and was interested in their welfare; that he was pleasant, cheerful, sociable, and agreeable to them around home and elsewhere; that he was always pleasant, cheerful, sociable, and agreeable to his friends, associates, and acquaintances; that he was a lover of home, and scarcely was away except upon business. Assume, also, that during all this time and since he reached his manhood he slept well at night, had a good appetite, that his reputation as a peaceable, law-abiding citizen was good; that his conduct and demeanor was exemplary. Assume, also, that shortly after he moved to Oklahoma on the farm he formed the acquaintance of William Bumgarner, a resident of Cleveland county; that their relations were friendly up until some time in 1907, the early part of 1907, or later; that in the early part of 1907 Bumgarner had some trouble with a man by the name of Kennedy, at Norman, Oklahoma, in or near the rear of a store building in said city, which resulted in the death of Ken-

nedy by Bumgarner, and following this Bumgarner was indicted in connection with said killing. Assume, also, that the defendant was a witness to said killing; that a short while thereafter Bumgarner, in person or through his friends, solicited or requested the defendant to testify in his behalf in the prosecution growing out of said killing, and that the defendant refused to do so, and as the result of which Bumgarner became sore at the defendant, which grew into some ill feeling upon the part of Bumgarner as against the defendant. Assume, also, that Bumgarner to some extent and on a few occasions abused the defendant on account of his failure to assist him in said criminal prosecutions, and threatened his life or to get even with him, or words to that effect; that following this the defendant became afraid of Bumgarner and fearful that Bumgarner would kill him; that Bumgarner threatened to kill him unless he left the county, or words to that effect; that this fear upon his part was partly real, but largely magnified and unfounded. However, there was some basis for the fear. Assume, also, that the family moved from Noble, Cleveland county, to Edmond, Oklahoma county, in the fall of 1912; that at that time, or shortly thereafter, the habits of the defendant began to change then in this: That he moved from place to place, in the state and out, and wandered here and there, working a little here and a little there, but not being steadily employed at anything for any great length of time. He came home occasionally, stayed a short while, and left; that he failed to look after and care for his mother and sisters, as he used to do; that he was idle, shiftless, restless, nervous, despondent, and depressed, and worried; that he was unpleasant to his mother and his sisters without cause, cared but little, or no interest in their comforts, without any cause; that they were good and kind to him, friends to him; that while at home he slept but little, wasn't sociable, pleasant, or agreeable to the members of his family and his friends and associates; that to his friends and associates he appeared worried, depressed, and sad; that this

condition continued to a more or less degree for the year 1913 and 1914. Assuming, also, that upon returning home from time to time he would inquire if Bumgarner had been there, or been inquiring for him, or if any one had been there, inquiring for him, and if he learned that there had been he would then have the members of the family describe the parties inquiring and ask if it was not Bumgarner; that frequently and when at home he would complain that Bumgarner had followed him wherever he went, wherever he had been, and was shadowing him and seeking to and would kill him if he got an opportunity, all of which was not true in reality, but to a limited extent, and that wherever he went, or whatever he was doing, Bumgarner was after him; that he couldn't work and do any good anywhere; that he had done all that he could do, and he couldn't do any more. Also assume that in these conversations he would cry and shed tears, become restless and worried. Assume, also, that during this time his appetite was bad, he slept but little at night, and that he decreased in weight and became poor and pale. Assume, also, that when he was at home at night that he would see that the doors were locked, the window blinds were down; that he seemed to be uneasy and fearful that Bumgarner would kill him, or was wanting to kill him, or watching to kill him, watching an opportunity to kill him; and assume, further, that this condition grew worse and became more noticeable during the year 1914, and particularly during the summer and early fall of 1914. Assume, also, that during the fall of 1914 he worked for different parties, but that he would work only a short time at each place; that wherever he worked he appeared to be depressed, worried, and bothered, was sad and despondent; that he had but little to say; that he but seldom or never smiled, or paid any attention to his friends or associates. Assume, also, that on different occasions during the years 1912, 1913, and 1914 he complained to members of his family and his friends that he was in trouble; that Bumgarner was going to kill him, and the cause of it was the

fact that he wouldn't testify for him in the criminal case above referred to; that he had it in for him and was laying for him, following him, shadowing him wherever he would go; wherever he went Bumgarner was after him, seeking to kill him, which was not true. Assume, also, that frequently he would pass his friends without recognizing them; that he was neglectful and forgetful of his friends, indifferent and cold-natured and cool toward them. Also assume that, when he would complain to his family about his troubles, they would assure him that there was nothing in it; that he would then complain that they were against him, and were lending assistance to his enemies on the part of Bumgarner, who was trying to kill him, all of which was not true; that his friends were his friends, and no trouble existed in the family at all; the relations were pleasant and agreeable so far as they knew. Assume, also, that along in the early part of November, 1914, Bumgarner went to his mother's home in Edmond and inquired for the defendant, and on being advised that he was not there he said to the sister of the defendant that he came there to see him; that he had told him to leave the country; that if he didn't leave the country he would kill him on sight, or words to that effect, or that he should leave, and the whole family should leave; that the visit of Bumgarner was made known to the defendant, and he became worried, depressed, cried, restless, uneasy; that following this he went away from home. Shortly afterward he came to Norman, Oklahoma, one Saturday, and that he seemed to be worried and depressed and sad and despondent; that on the Sunday following that he went to his brother's in Cleveland county, where he stayed overnight, and there he complained that Bumgarner was going to kill him, and he must leave the country, or else he would get killed. Now assume, also, that his brother advised him that he was mistaken and that he insisted that he was not; that Bumgarner was continually after him and was determined to kill him, and he would have to leave the country or else he would be killed; that wherever he went

he was shadowing him and following him for that purpose. Assume, also, that he was restless and worried; that on Monday morning he went to a sale with his brother, and he left the sale without saying anything to his brother, and went from there to a country store at Maguire, and while there he was restless and worried; that during the day he went to another sale where there was a large crowd of people assembled; that he watered and fed his horse, went out into the crowd, stood around for a short time, and all at once he espied Bumgarner, whereupon he remarked, 'Bumgarner,' and proceeded to shoot the deceased some six or seven times, and in fact shot him when he was down; that after he did the shooting he gave his pistol to some one; he didn't appear to be nervous, disturbed, or excited, was perfectly cool and deliberate, no change in his appearance or demeanor, being no noticeable change in his facial expression. Upon being advised that the deceased was not armed, he expressed surprise, stating that he should have been; that he was preparing to kill him and would have done so; that he was expecting him to, or words to that effect; that he made no attempt to get away, and remarked that he didn't want to; that following this the officer took him in charge and brought him to Norman, during which time he didn't appear to be worried nor excited, but was perfectly cool and deliberate and undisturbed. Assume, also, that this fear that Bumgarner was going to kill him and the belief that he was following him and shadowing him was not real, but there was some primary or some semblance or trouble in connection with he and Bumgarner, but this was a delusion of his. Now, assuming all these facts to be true in substance, I will ask you to state as an expert whether, in your opinion, the defendant was sane or insane at the time he killed the deceased? A. My opinion is that he was insane. Q. Doctor, what would be the character or form of insanity that he would be suffering with? A. Well, the form of insanity as outlined in the history of that case would be melancholia."

On cross-examination, the hypothetical question by Mr. Williams and answer are as follows:

"Doctor, I want to read a. hypothetical question to you: Assuming that the defendant in this case is a man 35 years of age, lived in Cleveland county, Oklahoma, for more than 10 years last past, a man of common school education and intelligence. In the last ten years the defendant and the deceased became acquainted; were friends up to something like a year prior to the difficulty, when they become enemies. Assuming, further, that the defendant in this case went to a citizen in the city of Norman and said to him: 'Bumgarner has been making threats and demonstrations against me. I am not afraid of him'—and that the defendant has seen the deceased from time to time. Assuming, further, that the deceased was a man 49 years of age, lived at Norman and engaged in different business enterprises in or about the city of Norman. Assuming that the defendant was a man who had always borne a good reputation for industry, moved with his family from the town of Denver to what is known as the Joe Winton farm, and from there to the town of Noble, during all of which time he was regarded as a sensible and fairly industrious man, intelligent and capable of looking after his business interest and affairs; that during said time he worked for different people; his labor was satisfactory; his conduct was that of an ordinary man; that he was good in figures, transacted his business in more than an ordinarily intelligent way; that during the time he lived at or near Denver his mental condition was never questioned, during the time that he lived on the Winton farm and at Noble he was regarded as a man of intelligence, during the time he lived at Noble he transacted business with merchants, ran open accounts with them, and was always regarded as a man of intelligence, during the fall of 1912, or the spring of 1913, he moved with his family to the city of Edmond, Oklahoma, and during all of this time he worked for different people for ordinary wages and kept a record thereof; in many in-

stances these figures were taken as a basis of settlement by
his employers; he was a man that was a good and capable
hand on the farm; that after his removal to Edmond he
worked for many different people, was quiet, unassuming,
but intelligent. About a year prior to the difficulty on this
occasion he went to one Key Boyd in the city of Norman
and said to him: 'Key, why is it Dr. Capshaw, you and
Bumgarner [the deceased] have it in for me?" Whereupon
the said Boyd said to him: 'Why, I can only speak for my-
self. As to Dr. Capshaw I know nothing. Of you and
Bumgarner I know nothing, but I am as good friend as
you ever had. If you will give me an opportunity to
prove my friendship, I will do so.' Whereupon the de-
fendant said: 'You can only prove your friendship in a
financial way. I know Bumgarner dislikes me [that is
the defendant talking now], for he has made physical
demonstrations indicating he doesn't like me, but I am
not afraid of him.' Thereafter the defendant was in and
about Norman where the said Bumgarner lived, and that
no trouble occurred between them, though they were in
the same town and the same place at the same time. `As-
suming, further, that the mother, sisters, and brother of
the defendant have testified in this case that there was
bitterness and implacable feeling existing between the de-
fendant and the deceased. Two of the sisters of the de-
fendant have testified that some years ago, as they were
going from Norman to the country with the defendant,
that Bumgarner caught up with them, and spoke roughly
to the defendant, and cursed him. Assuming, further,
that on many occasions the defendant stated to his mother
and sisters and brother that said Bumgarner was his bit-
ter enemy, following him. Assuming that some time dur-
ing the month of November, 1914, about four or five days
prior to the killing, the deceased, Bumgarner, went to the
home of the mother and sisters in the city of Edmond
after dark and seemingly intoxicated and said to Miss
Reed, the defendant's sister, 'Is Laney here?' whereupon
the sister replied that he was not. Said Bumgarner there-

upon stated, 'You are lying to me; he is here;' and the sister stated, 'No; he is not here;' and the said Bumgarner then stated in substance that he was going to kill him or drive him out of the country. Defendant, Laney Reed, was not at home at the time, but these statements of the said Bumgarner were communicated to him by members of the Reed family upon his return. And further assuming that after the breach between the defendant and the deceased the said defendant wouldn't stay in the house alone without drawing the curtains, wouldn't sleep in the house without locking the doors, and seemed to be apprehensive of the deceased—that he would do him some harm. About two or three weeks prior to the trouble, to wit, November 23, 1914, the defendant was in the city of Norman and met said Bumgarner and observed and saw him, said nothing to him; that on Thursday, Friday, and Saturday prior to the trouble the defendant was in the city of Norman, at which time the said Bumgarner was in said city; for a long time prior thereto had lived in the said city; that on Thursday and Friday prior to the killing the defendant met one Joe Haste in the city of Norman, at or near the opera house; that said Haste and the defendant, who had been friends for some time, had a conversation in which said Haste inquired of the defendant where he was now residing, to which inquiry the defendant replied, 'I am now living at Edmond with my folks.' Haste then asked the defendant what he was doing here. Defendant replied, 'I am here to collect some money from Bill Bumgarner,' the deceased in this case. 'He owes me, and he will not pay me.' Whereupon said Haste asked him, 'Why don't you sue him?' The defendant, Reed, replied: 'Bumgarner has sold his farm out here. He has got the money, and he will not pay me. I will not sue him. I will take it out of his damned hide.' Said Haste said to the defendant, 'You know Bumgarner will fight?' And the defendant replied, 'Yes, by God; I will fight, too.' The defendant was in and around Norman after that, and different witnesses testified to that fact—him being in and

around Norman many days prior to this killing. Assuming, further, that on the morning of the 22d day of November said defendant boarded the 9:30 o'clock southbound Santa Fe train, went to the town of Noble, where he previously had lived, and hired a horse from a liveryman named Johnson, but not until he had discussed the price and agreed upon the time when the horse should be returned. He stated to said Johnson that he was going to his brother's house near Henderson, something like 10 or 15 miles southeast of Noble; that he would return said horse the next day. Said defendant took possession of said horse under said agreement, and did go to his brother's, Dr. Reed's, who lived at or near Henderson, in Cleveland county, where he stayed all night Sunday night, the 22d day of November, 1914, and the next morning the defendant started back toward the town of Maguire, which is between Noble and Henderson, and met Mr. James May, a farmer who lives in the vicinity of Henderson, and who has known the defendant practically all of his life. Mr. May had a conversation with him, in which the defendant stated to him that he had been down to Dr. Reed's at Henderson and stayed all night the night before; that there was going to be a sale near Henderson on one Charles Greemore's farm. Whereupon the said May inquired of defendant just how to go to said sale, which direction was accurate and correct in every respect, which direction was followed by said May, who went to said sale. Assuming, further, James May, who has known the defendant most of his life, has testified that there was nothing wrong mentally with the said defendant at the time he met him, and further that he talked to him in his usual and intelligent manner. This was about 10 o'clock on the morning of the day of the killing about 4 o'clock. Assuming, further, that after the said defendant left said James May he met one Claude Scott at Maguire, at which place he engaged in a conversation with said Scott and told him he had stayed all night at his brother's, Dr. Reed's, and told him that there was a sale up at or near

the Champeau farm, seven miles south and west of Maguire, and requested said Claude Scott to go with him; whereupon the said Claude Scott said, 'No; I have no business there'; whereupon the defendant said, 'I have no business there either, but I thought I might see some old friends there, and I thought I would go.' Said defendant left said Claude Scott about 2 o'clock; started to Maguire riding the same horse he had hired from said Johnson at Noble the day before. That about an hour and a half or two hours after he left said Scott he rode up to the gate of said Champeau, where he met one James Hensley, a farmer and a former friend of years, and inquired of him whether or not he had seen anything of Claude Scott, the person whom he had just left at Maguire, not more than two hours ago. Assuming that a sale was going on there at the Champeau farm, where Mr. Champeau was selling his live stock and implements; that William Bumgarner and many other persons were there for the purpose of purchasing some property; that when said defendant reached said place he led his horse into the lot or inclosure and had him placed in the barn and fed. About twenty minutes or prior to the fatal trouble said Bumgarner and Roy Champeau had left the inclosure or lot just south of the house and started to the Champeau residence, when said defendant, Laney Reed, called to the said Champeau and says, 'Roy!' whereupon the said Champeau and Bumgarner turned around and faced south, so that the deceased and the witness Champeau faced the defendant to the south; that the deceased and the witness Champeau went into the house, and when they reached the house said Bumgarner remained in the house something like five or ten minutes, and went from the house back into the south lot, about ten or fifteen minutes thereafter. When said Bumgarner had gone back into the lot near the cement water trough the defendant approached from the south and cried out, 'Bumgarner!' Bumgarner faced the defendant, at which time the defendant presented a pistol. Bumgarner threw up his hands and said, 'Don't

do that!' and immediately following this the defendant began to fire an automatic pistol, and fired three shots into the body of the deceased who fell to the ground after said first three shots. After said first three shots there was a slight intermission. Then the defendant advanced upon the deceased, who was upon the ground. Deceased said in the presence of many witnesses, 'Don't shoot me any more; you have killed me;' whereupon the defendant renewed the firing and emptied his automatic pistol into the body of the deceased, firing all told into the body of said deceased some nine or ten bullets. The parties who saw the shooting immediately took hold of the deceased and carried him into the Champeau house, where in fifteen or twenty minutes he expired. Other persons there seized the defendant and disarmed him. That one Ben Craig, a farmer who was present and saw the shooting, said to him, 'Laney, why did you do that?' Whereupon the defendant said, in substance, 'I came out here to have it out; wasn't he armed?' Whereupon some one said, 'No; he wasn't armed.' Whereupon the defendant said, 'He ought to have been armed.' That shortly thereafter a farmer by the name of James Jackson, who had known the defendant for many years, said to the defendant, 'Well, you have killed Bill,' in substance, 'he is dying now.' Whereupon the defendant said, 'I am sorry,' and he said, in substance, he knew that it was coming. 'I expected to get killed myself. I surrender my gun. I know I couldn't get away from this crowd, if I wanted to.' Assuming, further, that the testimony in this case shows that the defendant stated to other parties immediately after the killing that the deceased ought to have been armed, if he wasn't. Assuming, further, that the defendant was disarmed, his pistol taken from him, by the parties at the sale; that he was placed in a buggy and brought to the city of Norman; that after he had left the Champeau farm and on the road to Norman, said defendant took from his pockets certain letters and papers, tore them into shreds, and threw them away; thereafter and on the way from

said Champeau farm to Norman he placed his hand in his pockets and drew therefrom two shells or cartridges which fit said gun, which he had previously given up; that as he traveled near Norman he said to his companion, or the person who had him in charge, 'I am afraid of a mob,' or in substance he was apprehensive that he would be taken from the person in charge of him and summarily dealt with, whereupon the person in charge of him said, 'If they come on you, I will give you the gun and let you fight it out with them.' The defendant said, 'All right; I am afraid of that outfit.' Defendant inquired, 'Have you phoned for the sheriff's force yet?' Whereupon the person holding him in custody, or in charge of him, said, 'Before I left the Champeau farm with you they had a call in for the sheriff, and they are on the road to meet us.' Defendant seemed to be greatly relieved when he learned that the sheriff was on the road to meet them and would protect them; that on the road from the Champeau farm to Norman the defendant met Hi Downing, a private citizen, Claude Pickard, sheriff of this county, Justice Linton, and others, and said custodians informed defendant that they would protect him; that they reached Norman about 5 or 6 o'clock; that he was then taken by the deputy sheriff of Cleveland county to Oklahoma City, and there confined in the county jail; that on the next day or two or three days the sheriff of Cleveland county, Mr. Claude Pickard, had a conversation with the defendant in Oklahoma City, in which the defendant said to him, 'Was Bumgarner armed?' to which Pickard replied, 'No'; to which the defendant replied: 'It looks like I took some advantage of him, but I didn't. He knew it was coming and should have been prepared. This is a grudge of long standing. I will tell you about it sometime, but it would take me an hour. I will relate to you all the facts sometime.' Assuming the state of facts presented to you, Doctor, embraced in the hypothetical question, to be true, would you say at the time he killed this man was he sane or insane? A. I think he was sane according to your hypothesis."

In rebuttal the state called Dr. A. D. Young, of Oklahoma City, who qualified as an expert alienist. In answer to the foregoing hypothetical question on Dr. West's cross-examination, he gave as his opinion that the defendant was sane. On cross-examination, counsel for the defendant read the hypothetical question propounded to Dr. West, and Dr. Young gave as his opinion that defendant was sane at the time he committed the homicide. Dr. D. W. Griffin testified that he was superintendent of the Hospital for the Insane at Norman, and in answer to each of the hypothetical questions above set out stated, "I think he was sane."

A large number of witnesses testified to intimate acquaintance with the defendant for several years; that they had met and talked with him shortly before the homicide, and on the same day; and stated that they noticed nothing to indicate that he was insane or irrational.

*J. B. Dudley*, for plaintiff in error.

*S. P. Freeling*, Atty. Gen., *Ben F. Williams*, and *John E. Luttrell*, for the State.

DOYLE, P. J. (after stating the facts as above). The plaintiff in error, Laney Reed, was convicted of murder and his punishment assessed at imprisonment for life at hard labor. The appeal is from the judgment rendered in pursuance of the verdict.

The first alleged error is the decision of the court overruling the defendant's application for a continuance. It appears from the record that the homicide was committed on the 24th day of November, 1914; that the defendant had a preliminary hearing December 7th, and on December 21st the information was filed in the district

court. On February 6, 1915, the defendant was arraigned and entered a plea of not guilty, and the case was set and assigned for trial March 2, 1915. Attorney Thomas W. Mayfield, of Norman, represented the defendant at the preliminary examination and continued to represent him up to the date of the trial. On February 22d Mr. Mayfield, as attorney for the defendant, caused subpoenas to issue for 22 witnesses to appear March 2, 1915. On the Saturday preceding Tuesday, the 2d day of March, Mr. Mayfield left Norman. On March 1st the court received a message from Dr. Mills that Mr. Mayfield was ill at Sasakwa, Seminole county. Judge Swank immediately directed Dr. Mills to notify Mr. Mayfield that the defendant's case would be called for trial March 2d as assigned, and appointed J. B. Dudley, of the Cleveland county bar, to represent the defendant. When the case was called for trial Mr. Dudley filed an application for continuance on the ground that he, as defendant's attorney, had not had sufficient time to prepare the case for trial, which application was supported by the affidavits of the defendant and his counsel. The application was resisted by counsel for the state.

We deem it unnecessary to quote the affidavits, except that of J. B. Grigsby, county attorney, which sets forth that all of the witnesses for the state and the defense are now in attendance at court; that Thomas W. Mayfield, attorney for the defendant, left the city of Norman "on last Saturday," saying that he was going to the city of Edmond; that Dr. Mills, referred to in the defendant's application for continuance, formerly lived at or near Henderson, Cleveland county, and is a warm personal friend of the defendant and his brother, Dr. C. C. Reed,

who has been at all times personally assisting in the defense and preparation of the case for trial; that upon the preliminary examination the testimony of all witnesses was taken by a competent stenographer, and a true and correct transcript of the testimony has been accessible to the defendant and his counsel for more than 60 days last past, and the state now tenders a copy of the same to counsel appointed by the court to defend him; that more than 30 days prior to this date the defendant, his relatives, and friends consulted with the said J. B. Dudley relative to employing him as counsel in his case; that the said J. B. Dudley has had a fair opportunity ever since his appointment to consult with the defendant and his witnesses. Traversing the state's objection, J. B. Dudley filed his affidavit, in effect, that he had never talked with the defendant, or any of the defendant's family, about the facts in the case; that he never knew, nor had any knowledge, as to the defense, or the facts relied upon as a defense, in this case until 5 o'clock "yesterday" afternoon, when he had a brief conference with Dr. Reed, the brother of the defendant. Thereupon the court announced that he would postpone the case until the next day, "provided that the defendant does not ask for a further continuance at that time." To this offer the defendant refused to accede.

No ruling is more firmly established in this state than that this court will not reverse a judgment of the trial court upon the ground that it refused to grant a continuance, unless it appears that such court has manifestly abused its discretion in refusing it. A careful examination of the record fails to disclose any abuse of discretion on the part of the trial court. The defendant had the benefit of the services of an able lawyer appointed by

the court to defend him, and the record discloses that he was defended with great ability. We are of the opinion that it was not error for the court to overrule the applications for continuance.

It is also insisted that the court erred in refusing to permit the defendant to introduce in evidence and read to the jury Exhibits 1 to 7, inclusive, which were offered in evidence by the defendant and excluded by the court: Exhibit 1, an envelope addressed, "Oklahoma City Times, Oklahoma City, Okla.," with letter therein, bearing no date, signed "Laney Reed." Exhibit 2, an envelope addressed, "Miss Euna Reed, Trousdale, Okla.," with letter therein, dated "Oklahoma City, March 9-14," signed "Laney Reed." Exhibit 3, an envelope addressed, "Miss Euna Reed, Edmond, Okla.," with letter therein, no date, signed "A. L. Reed." Exhibit 4, envelope addressed, "Dr. C. C. Reed, Trousdale, Okla.," with letter therein, dated "Oklahoma City, March 10-14," signed "Lannie." Exhibit 5, envelope addressed, "Miss Hattie Simmons, Clarksville, Ark.," with letter therein, dated "Edmond, January 19, '14," signed "Lannie." Exhibit 6, envelope, with letter therein, dated "Oklahoma City, Nov. 1-14," addressed "Dear Mother," signed "Lannie." Exhibit 7, a note addressed to "Claude," no date nor signature.

As a predicate for the introduction of these exhibits, Dr. C. C. Reed testified that shortly after the homicide he found these envelopes in the defendant's trunk, at his home in Edmond; that Miss Maude Olden and his two sisters were present at the time; that the handwriting was, and the signatures thereto were, the defendant's. On cross-examination, he was asked:

"Q. Did you ever take a writing tablet to your brother after he was put in jail on the charge of this. crime? A. I may have—I don't remember."

Miss Olden and the defendant's two sisters testified that they were present when ·Dr. Reed found the letters in the defendant's trunk; that thy did not know anything about them until Dr. Reed found them there. In prac- tically all of these so-called letters the defendant states. that he was present and witnessed the killing of Kennedy in the rear of Berry's store at Norman; that Capshaw, Bumgarner's brother-in-law, and Key Boyd, his nephew, were present, assisting Bumgarner, when he hit Kennedy with a scale weight; that if he had shot Bumgarner there and stood his trial he would be out free now; that he should have made known the fact that he was present and witnessed this murder; that his failure to do so was the cause of his ruin; that he' was going to do what he should have done seven or eight years before. In two or three he states that he intends "this to be his last letter."

The following objection was made to the offer of each exhibit:

"Mr. Williams: Objected to, for the reason it is in- competent, irrelevant, and immaterial, no proper founda- tion having been laid for its introduction; has no postal mark, and no witness has testified that the defendant wrote it before he killed Mr. Bumgarner."

Exceptions were taken to the rulings of the court excluding these .exhibits. Counsel for the defendant con- tends that the letters were competent and admissible as tending to show that the defendant was. insane. The case of *Blume v. State,* 154 Ind. 343, 56 N. E. 771, is relied upon to support his contention. In the Blume Case, a trial for murder where the defense was. insanity, certain

letters written by the defendant to the deceased were introduced by the state over the objection of the defendant for the purpose of obtaining the opinion of an expert witness upon the question as to the sanity of the defendant at the time of the homicide and shortly before that occurrence. After such examination, and upon the basis of the same, the witness was permitted to give his opinion as to the sanity of the writer. The court held:

"Where the sanity of the accused is in issue, letters written by him during the period of his alleged insanity may be given in evidence for the purpose of obtaining the opinion of an expert as to his sanity."

In the opinion it was said:

"Written communications, as well as oral conversations, may afford evidence of the soundness or unsoundness of the mind of the writer, and may constitute a sufficient basis for the opinion of a skilled physician or alienist upon that subject. Indeed, evidence of this character is regarded as of especial value in many cases, and as furnishing important tests of insanity. The following, from a standard work upon Medical Jurisprudence, is directly in point: 'The value of letters or other writings, as tests of insanity, has been shown by abundant illustrations by Marce, in a monograph on this particular topic. To these might be added a series of cases, English and American, in which the sanity of testators and of obligors has been in a large degree determined by the characters of written documents emanating from them. Nor is such evidence without its worth in criminal prosecutions, especially where the question is whether insanity is genuine or simulated. It is not merely the contents of writings that contribute to the decision of the question. The style and handwriting often supply important tests. "What experienced forensic physician," asks Liman, "is not familiar with the writings of certain classes of lunatics, namely, the so-called 'querulants'—writings teeming

with flourishes, words and sentence italicized singly, doubly, or trebly, with parenthesis, interlineations, notes of quotation; writings often very voluminous, swollen with citations of alleged laws?" In other cases of lunacy are noticed peculiar modes of construction, words and expressions both original and incomprehensible, such as are familiar to every psychological physician. The first stages of paralysis are characterized by flightiness of writing, omissions of words and sentences, blots,' etc. 1 Whart. & S. Med. Jur. par. 387."

Upon the question of the insanity of a defendant charged with crime, evidence of his acts, conduct, and declarations, so far as they relate to, are connected with, or illustrate, or afford material evidence of, his mental condition at the time of the commission of the act charged, is admissible, and written communications, as well as oral statements, tending to show his insanity, are admissible; but there must be a reasonable discretion in a trial court to restrict such evidence, and to exclude it when it is not entitled to any legitimate effect upon the question of his mental condition at the time of. committing the act charged. However, a defendant cannot make substantive evidence in his own favor by proving self-serving declarations or written statements out of court, under the claim that the same would afford ground for argument that he was insane, and thus make his defense of insanity, without being subject to cross-examination as a witness in his own behalf. In the Blume Case, the letters were not self-serving declarations as in this case. In fact, the writings offered in evidence in this case are not, strictly speaking, letters. At most they are merely written statements, and as such were admissible only for the purpose of obtaining the opinion of an expert thereon as to the writer's sanity.

They were not offered for this purpose; hence there was no error in their exclusion.

The next and last error assigned and argued in the brief is:

"Misconduct of the county attorney in his opening argument to the jury, in which he indirectly referred to the fact that the defendant did not testify."

This assignment is not properly presented by the record. The objection or exception taken to the alleged remarks of the county attorney is attempted to be shown by an unsigned bill of exceptions to the effect that the county attorney in his opening argument made the following statement:

" 'After this defendant shot and killed the deceased, when the bystanders ran in and took charge of him and disarmed him, he said, "You need not hold me; I cannot get away in all this crowd, and I will not try to; I have done what I came here to do, and I am willing to take the consequences;" and then he just closed up like a clam and he has been closed up ever since.' To which statement of the county attorney the counsel for the defendant at the time objected, which objection was by the court overruled, to which action of the court the defendant by his counsel excepted, and still excepts.

"J. B. Dudley, *Attorney for Defendant.*"

In opposition to the bill of exceptions submitted, J. D. Grigsby, county attorney, filed his affidavit, in which he admits that he used in substance the language set forth in the bill of exceptions of the defendant, and concludes as follows:

"Which argument was based upon the testimony of witnesses of the state in said cause, and the county attorney, further discussing the conduct, action, and state-

ment of the defendant, said, or attempted to say, when interrupted by counsel for the defendant, after his conversation with Claude Pickard, the sheriff of Cleveland county, that some time he would tell all about the trouble, but in substance that it would take him a considerable length of time to relate the trouble, but he closed up like a clam, and never did tell Mr. Pickard what caused the trouble, as he agreed to tell him. That I, the county attorney, J. D. Grigsby, in my argument to the jury, only referred to the conversation of the defendant with Claude Pickard, as to what the defendant agreed to tell him about the cause of this trouble, and never did, directly or indirectly, refer or attempt to refer to the defendant's failure to take the stand."

The defendant filed the affidavit of J. B. Dudley, and offered the affidavits of Tom Cheatwood and Dr. Claude Reed, brother of the defendant, in support of the bill of exceptions. The court refused to settle or sign the bill of exceptions. Under the provisions of our statute, it is the privilege of a defendant to have the argument of counsel taken by the court reporter, and the proper way to present misconduct on the part of a prosecuting attorney is by objection made and exception duly reserved in the record. However, under our practice, if the court settles and signs a bill of exceptions, showing alleged misconduct, the question will be reviewed; but where, as in this case, the court has failed to settle and sign the bill of exceptions, the question is not properly presented for review. However, we will say here that we are inclined to think that the remarks of the county attorney, as shown by the unsigned bill of exceptions, were a proper and legitimate comment upon the evidence of the case, and were not intended or calculated to direct the attention of the jury to the fact that the defendant did not elect to testify as a witness in his own behalf.

. No objection was made or exception taken to the instructions given by the court, and the law applicable to the defense of insanity was fully and fairly submitted to the jury. Upon a careful consideration of all the evidence no possible doubt of the defendant's guilt can be entertained; his whole conduct showed a deliberate purpose to kill and murder the deceased, and the shooting was the willful, deliberate, and premeditated act of a person who understood perfectly well the nature and consequences of his act. Upon the whole record we are of opinion that the defendant had a fair and impartial trial, with every right accorded to him that the law justifies or requires, and it would have been a miscarriage of justice, as we think, if upon the evidence any other verdict had been rendered.

The judgment of the district court of Cleveland county herein is therefore affirmed.

ARMSTRONG and MATSON, JJ., concur.