## DAVID B. REED v. STATE.

No. A-4040.     Opinion Filed Feb. 10, 1923.
(212 Pac. 441.)

(Syllabus.)

1.  Homicide—Evidence Sustaining Conviction for Murder. In a prosecution for murder, wherein the defense was insanity, evidence considered, and held sufficient to support the conviction without the death penalty, and that no prejudicial error was committed on the trial.

2.  Evidence—Presumption of Sanity. A person is presumed to be of sound mind until the contrary is shown.

3.  Homicide—Defense of Insanity as Question for Jury. On a trial for murder, where evidence is introduced which in any degree tends to support the defense of insanity at the time of the commission of the homicide, the issue as to whether or not the defendant was then sane or insane is a question of fact for the jury to determine under proper instructions from the court.

Appeal from Superior Court, Creek County; Gaylord R. Wilcox, Judge.

David B. Reed was convicted of murder and he appeals. Affirmed.

Thompson & Smith, for plaintiff in error.

The Attorney General and N. W. Gore, Asst. Atty. Gen., for the State.

DOYLE, J. Plaintiff in error, David B. Reed, was convicted of murder, and in pursuance of the verdict of the jury was sentenced to imprisonment in the penitentiary for life at hard labor. He has appealed from said conviction to this court, but there has been no appearance in his behalf on his appeal. We have nothing before us but the petition in error and case-made.

The information charged him with the murder of one Roy Perrick, alleged to have been committed on the 24th day of July, 1920.

The assignments of error are that the verdict was contrary to the law and the evidence; that the court erred in admitting incompetent testimony over the objection of the defendant, that the court erred in excluding competent testimony offered by the defendant; and that the court erred in giving certain instructions.

The evidence shows that Roy Perrick, the deceased, resided with his wife and three children in Drumright; that his sister, Mrs. Eula Reed, was visiting at his home; that on the date alleged defendant came to the home of deceased, and took a pistol from his pocket and attempted to shoot Mrs. Eula Reed; that while she was trying to take the pistol from him, deceased returned to his home, his wife met him in the yard, and told him that David Reed was in the house and was attempting to shoot his sister. Deceased entered the house and was shot by defendant. From the effects of the wound he died about 10 minutes later.

The testimony on the part of the state may be briefly stated as follows:

Mrs. Eula Reed testified:

"I lived at my brother Roy Perrick's home about two weeks; on the 24th day of July, 1920, about 6 o'clock in the afternoon, defendant, David B. Reed, came to the house. He took a telegram and a gun out of his pocket, and said he was going to kill me; I grabbed the gun, and we scuffled out of the house and then back in. We both had hold of the gun most of the time. He told me to sit down, and I did, then he threw the gun in my face, and we scuffled again; I heard the car coming, and my brother came in, and defendant shot him. I never heard a word spoken. My brother ran out, I followed him, and the defendant shot me in the back. My brother ran towards Mrs. Drumright's house. The defendant overtook me at Mrs. Drumright's gate, and we scuffled over the gun into her house. I took the gun from the defendant, and handed it to Bertha Billings. My husband

died from T. B. at Garden City, Kan. He had been dead 24 days when the shooting occurred; the defendant had tried to force me to live with him out of wedlock in every way he could; he said I might as well live with him as anybody. I always refused and every time he said he would kill me if I would not live with him."

Mrs. Bell Perrick testified:

"I am the widow of Roy Perrick. Mrs. Eula Reed is the sister of my husband. She had been at my house about 10 days. I was at the well, and saw the defendant coming towards the house; he came into the kitchen, and drew a gun and telegram out of his pocket, and told her he was going to do what he said he would do. She grabbed the gun, and they scuffled out of the house and back into the house. I was begging him to quit and let her alone. My husband was downtown. I went out and saw my husband coming, I told him Dave Reed was in the house and had a gun and was going to shoot Eula. My husband said, 'Oh no; he is not going to shoot her;' and he went into the house. I ran to give Mrs. Drumright my baby, and I heard two shots fired in the front room of my house. My husband came out and said 'I am shot, and I am dying.' The defendant passed him, running after my sister-in-law. My husband died in a few minutes."

The sole defense interposed was that of insanity.

As a witness in his own behalf defendant testified as follows:

"State to the court and jury whether or not you have now any independent recollection of being present at the Perrick home on the 24th day of July, 1920, or at any time, armed with a revolver, and having leveled that revolver at Perrick or any one else and fired the same. A. I do not.

"Q. State when was the first time of you knowing that you had shot Roy Perrick. A. Some time in September, I was in the county jail at Sapulpa, and my brother came to me and told me."

On cross-examination he was asked:

"Is it not a fact about 4 days after this alleged homicide, while you were in the county jail, you wrote a letter to Eula Reed? A. I could not say that I did. (Letter produced and handed to witness.)

"Q. Is that instrument in your handwriting? A. I believe it is.

"Q. Then you wrote that? A. I must have written it."

The letter was then introduced in evidence and read to the jury. It reads as follows:

"Mrs. Eulah Reed, at Home: Dear Eulah. Will send you this missive in inquiry as to your condition. How are you getting along? Fine I hope. Let me know how you are for I am very sorry for you for I know that you must be suffering this hot weather. I hope that you will get well all right. I wish that I could see you for we have had such good times together. Now sweetheart you know that I can't write what I would like to. Come down to see me Dear. The Jailor wont let you get close enough to me to hurt you, and I would not any way, for I see my folly now. So please come and see me for it wont be long until I will be shut up for life or Electrocuted and then I never can see you again. So grant me the pleasure of seeing you any way at least once, for I still love you, As ever, David B. Reed."

Two physicians as medical experts testified that they had made a personal examination of the defendant, and found that he had a fracture of the skull and an infantile left arm; that the effect of the fracture of the skull might cause epileptic insanity, and that they found the defendant afflicted to such an extent that he is a fit subject of psychic epilepsy.

D. B. Reed, father of defendant, testified:

"My son David B. Reed will be 28 years old the 20th day of June, he was born with his arm in that shape; when he was 3 or 4 years old he jumped out of a chair on his head,

and made that hole that is there now; at times he seemed to get along pretty well, and at other times he seemed to have no sense at all. He had violent spells, and we could not do anything with him; he threatened lots, but he never hurt us.''

Three or four witnesses testified to intimate acquaintance with the defendant for several years, and to acts, conduct, and declarations tending to show that he was not a person of sound mind, and gave as their opinion that the defendant was not rational.

In rebuttal the state offered evidence tending to show that the defendant was not insane.

Mrs. Eula Reed, recalled, testified she was acquainted with the defendant for about 8 years, and during that time he did not have any epileptic fits or convulsions of any kind.

Several witnesses testified that they talked to the defendant shortly after the homicide, and he stated that he sent a telegram to Eula Reed from Oklahoma City, and signed his cousin's name to it, and she replied, saying she would meet him in Ardmore on Saturday; that he was jealous of her and his cousin, and when he got this answer it made him mad; that he went to a pawnshop in Oklahoma City and bought a pistol for $8 and came to Drumright, intending to kill Eula Reed; that he went out to Roy Perrick's house and was quarreling with Eula Reed when Perrick came in, and he shot Perrick and then shot Eula Reed as she went out the door; that Eula Reed then took the gun away from him.

Two physicians as medical experts testified that from their examination of the defendant they believed his reasoning faculties were good. In answer to proper hypothetical questions they stated it was their opinion that the defendant was sane.

There is no conflict in the evidence as to the facts and circumstances of the homicide.

It is our conclusion, after carefully considering all the testimony in regard to the mental condition of the defendant at the time of the homicide, that the killing was the willful, deliberate, and premeditated act of a person who understood perfectly well the nature and consequences of his act, and we feel constrained to say that we have seldom read a record of conviction where there were less palliating circumstances in behalf of the defendant than this case presents.

The capacity to know right from wrong, and to know that the particular act being committed is wrong, is recognized as a correct rule in Oklahoma to test the question of criminal responsibility.

In the case of Adair v. State, 6 Okla. Cr. 284, 118 Pac. 416, 44 L. R. A. (N. S.) 119, it is said:

"The defendant is presumed in law to be sane and capable of knowing right from wrong as to the homicidal act and to understand the nature and consequences of such act, and, unless the proof on the part of the prosecution is sufficient to raise a reasonable doubt of the defendant's sanity at the time of the commission of the homicide, the burden is upon the defendant, in the first instance, to overcome this presumption by introducing sufficient evidence to raise a reasonable doubt of his sanity when the act was committed. When he has done this, the prosecution, in order to convict, must prove the defendant's sanity beyond a reasonable doubt, and if, on a consideration of all the evidence, the jury entertain a reasonable doubt as to the defendant's sanity when the act was committed, he should be acquitted."

And see Alberty v. State, 10 Okla. Cr. 616, 140 Pac. 1025, 52 L. R. A. (N. S.) 248; Smith v. State, 12 Okla. Cr. 307, 155 Pac. 699; Hodges v. State, 16 Okla. Cr. 183, 182 Pac. 260; Roe v. State, 17 Okla. Cr. 587, 191 Pac. 1048.

The defense of irresponsibility, at best, presents a question of fact for the jury, and, when they have settled that question without passion or prejudice in accordance with the evidence, it is not the province of this court to disturb the verdict of the jury.

There was no error in the rulings of the court on the admission or the exclusion of testimony. The letter written by the defendant a few days after the homicide to Mrs. Eula Reed was properly admitted.

In the case of Reed v. State, 14 Okla. Cr. 651, 174 Pac. 800, it is held that when the sanity of the defendant is in issue, letters written by him during the period of his alleged insanity may be given in evidence for the purpose of obtaining the opinion of an expert as to his sanity.

Upon a careful consideration of all the instructions given we are of opinion that the law of this case was fairly and fully presented to the jury, and the record shows that no objections were made or exceptions taken to the same.

Upon the whole record we are of opinion that the defendant had a fair trial, with every right accorded him that the law justifies or requires, and our conclusion is that the law can only be vindicated by an affirmance of the conviction. The judgment of the superior court of Creek county herein is therefore affirmed.

MATSON, P. J., and BESSEY, J., concur.