## MARY F. ROE v. STATE.

No. A-3242.   Opinion Filed Aug. 28, 1920.

(191 Pac. 1048.)

(Syllabus.)

1. CRIMIANL LAW—Criminal Responsibility—Mental Capacity. Under subdivision 4 of section 2094, Rev. Laws 1910, the test of criminal responsibility for committing an act which is declared to be a crime is fixed at the point where the accused has mental capacity to distinguish between right and wrong as applied to the particular act, and to understand the nature and consequences of such act.

2. SAME—Insane Persons—Instructions. For reasons holding refusal to give certain requested instructions on the subject of insanity not to be reversible error in this case, see body of opinion.

3. EVIDENCE—Evidence of Motive. Where one of the defenses interposed is that defendant did not commit the crime, evidence tending to establish a motive on the part of the defendant to commit the crime is properly admitted.

4. WITNESSES—Nonexpert Opinions on Insanity of Accused—Prior Statements of Witness. Where a nonexpert witness is permitted, after proper predicate, to express an opinion that defendant is insane, the fact that such witness expressed the same opinion to the brother of defendant prior to the commission of the alleged crime is immaterial, and properly excluded,

where no effort was made to show that the witness had expressed opinions out of court inconsistent with such testimony.

*Appeal from District Court, Pawnee County;*
*Conn Linn, Judge.*

Mary F. Roe was convicted of the crime of murder, and she appeals.   Affirmed.

*William L. McCann,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

MATSON, J.   This is an appeal from the district court of Pawnee county, wherein the defendant, Mary F. Roe, was informed against and charged with the murder of her husband, Jesse Roe, on the night of April 25, 1917.   The trial resulted in a verdict of guilty of murder, and punishment fixed at confinement in the state penitentiary for life. From the judgment rendered in accordance with the verdict, defendant has appealed to this court, and seeks a reversal upon several grounds, which will   be   hereinafter considered.   A short statement of the facts connected with the killing follows:

Mary F. Roe at the time of the   killing   was   in   the neighborhood of 35 years of age, and was keeping a rooming house at Drumright, Okla.   She had been previously married, when about 19 years of age, to one Vernon Osborne, an oil well driller, and to this union one son was born, Bernard Osborne, who was about 16 years of age at the time of the trial.   Vernon Osborne was   addicted   to hard drinking, and some 5 or 6 years after the marriage the defendant procured a divorce from him and the custody of her son.   Some 6 months thereafter   Vernon  Osborne died of typhoid fever.   Defendant never married again, un-

til her marriage to Jesse Roe at Pawnee, Okla., on April 23, 1917. After defendant's marriage to Osborne, she lived in Ohio, West Virginia, Indiana, and Illinois, and in 1912 came to Drumright, Okla. She lived almost exclusively in localities where oil development was active. Two of her brothers were drilling contractors, and after her divorce from Osborne assisted her materially in a financial way. So far as the record shows, the defendant lived, prior to commission of this alleged homicide, a clean and moral life in a rather rough environment. She was considered industrious, but not a successful business woman. She had worked as a domestic, and at times had kept boarding house camps in and around the oil fields.

It was while engaged in the latter business that she first met the deceased, Jesse Roe, about the year 1914. Roe was considerably older than the defendant, and was not a man of education. During his frequent visits to the defendant, he often got her to transact his business for him. He had furnished her money, and she said that she married him for money. Before their marriage, and just after, she went to various banks inquiring as to Roe's financial condition, his deposits, his checks, and his lands, and made special inquiry about cashing checks, and of her own authority to sign checks for Roe. Defendant appeared to be ashamed of her marriage with Roe, but executed it for the reason that she had a sick boy that had to be provided for. It was the request of both parties that the marriage be kept a secret. Deceased told that he had procured a farm and was going to move out onto it when married. About the time they moved onto the farm, and 2 or three days before the commission of the homicide, the defendant obtained a new pistol and cartridges for the same, and also got a new trunk and rope for the same. She told a person

residing close by that there were rats at their new place, and that she was afraid of rats, and that if he heard a shot fired he need not be alarmed or come to her. She also told neighbors, before she was married, that she was going away and would be gone about 10 days. Jesse Roe was shot in the head, and by a bullet of the same size as that of defendant's pistol. Her pistol had one chamber that had been fired. The killing took place at the farm home, to which they had moved about 2 days previous. The body of the deceased was found in the trunk that defendant had taken out there, and the trunk was tied up with the cord.

After the killing, defendant telephoned for an auto, and after the automobile came blood was seen dripping from the trunk, and, on being asked about it, defendant told the chauffeur that she was carrying some fresh pork to Drumright. On being pressed further, she admitted to the chauffeur that Jesse Roe's body was in the trunk. She endeavored to persuade the chauffeur not to disclose that fact, and wanted the chauffeur to tell her where she could find a stream deep enough to cover the trunk, and also said that, if she could have gotten the trunk to Drumright, she would have had no trouble. She denied killing her husband, but said that he was killed by a man who came to their house after night. She claimed that she had not been well, and was sleeping in the bed in the northwest corner of the west room, and that Roe was sleeping on a cot or pallet in front of the bed; that she awoke about midnight, hearing Roe and some man quarreling, and that the man was shaking his fist at Roe and saying, "Damn you, you will implicate me, will you?" and that Roe replied, "Ed, damn you," or "God damn you, I will shoot

you," and reached toward the foot of the bed for a shotgun; that she called out to Roe, "Oh! don't shoot him;" that the man drew a revolver and fired, hitting Roe in the head. Some bloody bed clothing and partly wiped-up blood spots on the floor in the west room were discovered; also a shotgun, two revolvers, the tray of the trunk (in which the body of deceased had been placed), with some female wearing apparel piled on top of it, were found in the west room.

The defendant pleaded insanity, and there was evidence introduced from a number of lay and expert witnesses to the effect that they believed the defendant insane, the expert witnesses testifying that the defendant is of the type of insane known as *dementia praecox* of the paranoid type; that she is an hypochondriac, with delusions or hallucinations of pulmonary tuberculosis and cancer; that she also has delusions of persecutions; also delusions that one of her brothers, who had been kind to her, was very unkind to her; and that she had at times theatened to kill this brother. There were no manifestations of violence on the part of the defendant, testified to by any witness, prior to the alleged commission of this homicide by her. On the part of the state, there was some evidence to the effect that the defendant, shortly prior to and shortly after the commission of the homicide, appeared to be rational and in a composed state of mind.

On the question of insanity, the court gave the following instructions, to which proper exceptions were taken:

"In addition to her plea of not guilty, the defendant claims that, if she killed the said deceased, Jesse Roe, said act was not criminal, for the reason that her mental condition was such, at that time, that she was not responsible for said act, and therefore was excusable.

"Under her plea of not guilty, she has a right to offer as many defenses as she sees fit, whether such defenses are consistent or inconsistent, and the fact that she may interpose inconsistent defenses raises no presumption against her by reason of any apparent inconsistency.

"You are instructed that the defendant has interposed as one of her defenses in this case the defense of insanity. When that defense is interposed, the burden of proof is upon the defendant, unless the evidence on the part of the state be sufficient for that purpose, to introduce sufficient evidence to raise in your minds a reasonable doubt of her sanity. It is not required that the defendant shall prove her insanity to the satisfaction of the jury by competent evidence beyond a reasonable doubt, or by a preponderance of the evidence. It is sufficient if she introduces sufficient evidence to raise in your minds a reasonable doubt of her sanity, and when this is done you are instructed that the burden of proof is upon the state to prove such a state of sanity on the part of the defendant as would make her criminally liable by competent evidence, beyond a reasonable doubt, before you would be justified in convicting the defendant of the crime charged in the information.

"You are instructed that the law presumes every person to be sane and of sound mind, and able to distinguish right from wrong as applied to any particular act, and to understand the nature and consequences of such act, until a reasonable doubt of his or her sanity is raised by competent evidence, and that it is an essential ingredient of crime that a person, to be guilty of a crime, must have, at the time of its commission, sufficient mental capacity and reason to enable them to distinguish between right and wrong as applied to the particular act that he or she is then about to do. Although one may be in a diseased or unsound condition of mind, brought about by any condition, such as brooding over wrongs done to her, either real or imaginary, or produced by any other cause, if at the time they commit a crime they know and understand the nature

and character of such act and its consequences, and at that
time know that it is wrong and criminal to commit such an
act, and have sufficient mind to apply that knowledge to
her own acts, and to know that if she does commit such
acts she will do wrong, and subject herself to punishment,
then and in that event such diseased or unsound condition
of mind is not sufficient to exempt or exonerate her from
criminal liability. So in this case, although the jury may
believe from the evidence beyond a reasonable doubt that
at the time of the commission of the crime charged in the
information, if they believe and find she did commit it as
charged, still if they further find and believe from the evi-
dence beyond a reasonable doubt that at the time said
crime was committed the defendant had sufficient mind and
reason to know and distinguish right from wrong, and
that if she did commit such crime it would be in violation
of the law and subject her to punishment, and to know
and realize the consequences of such an act, and had mind
sufficient to apply that knowledge to the consequences of
her own act, then in that event she cannot escape criminal
liability under her plea of insanity, and the jury should
find her guilty as charged in the information and fix her
punishment accordingly.

"You are instructed that, if you have a reasonable
doubt from the evidence, or lack of evidence, as to whether
the defendant or some person other than the defendant
committed the homicide charged in the information, then
you should give the defendant the benefit of such doubt,
and return a verdict of not guilty.

"And you are further instructed that, if you believe
from the evidence in this case beyond a reasonable doubt
that the defendant committed the crime in the way and
manner as charged in the information, and shall further
believe from the evidence that at the time she did so she
was of unsound mind, sufficient as herein defined to exempt
her from criminal liability, by reason of insanity or un-
soundness of mind, or the evidence raises a reasonable
doubt in your mind as to whether she was sane or insane

at the time, then and in that event you should resolve that doubt in favor of the defendant, and acquit her.

"If you find, from the evidence, beyond a reasonable doubt, that the defendant killed the deceased, Jesse Roe, and you should entertain a reasonable doubt, from the evidence, as to her sanity at the time of the homicide, and you acquit her upon that ground, you should so state in your verdict, and in such case, if you further find it dangerous to the public peace or safety to discharge her, you should also state that finding in your verdict."

On this question, the defendant requested the court to give the following instructions, which were refused, and proper exceptions taken to such refusal by counsel for defendant:

"A homicide committed by a person in a state of insanity constitutes excusable homicide.

"It is an essential ingredient of crime that a person, to be guilty thereof, must have, at the time of its commission, sufficient capacity and reason to enable her to distinguish between right and wrong as to the particular act she is then doing. Every person is presumed to be sane, or of sound mind, and able to distinguish between right and wrong, as applied to a particular act, and to understand the nature and consequences of such an act, until a reasonable doubt of her sanity is raised by competent evidence. Although one may be in a diseased or unsound condition of mind, brought about by brooding over wrongs to herself, either real or imaginary, or produced by disease or other causes, if, at the time she does an act, she understands the nature and character of such act and its consequences, and at that time knows that it is wrong and criminal, and she had mind sufficient to apply that knowledge to her own case, and to know that, if she does the act, she will do wrong, and be subject to punishment, such diseased or unsound condition of mind is not sufficient to exempt her from responsibility for her said act; but if, at

the time she does the act, her mind is in such a diseased and unsound state that for the time being her reason, conscience, and judgment are overthrown, and in committing the said act she does so from an irresistible and uncontrollable impulse, the law excuses her from criminal liability.

"You are instructed that, under the law of this state, the test of criminal responsibility for committing an act, which is a crime under the law, is the mental capacity to distinguish between right and wrong, as applied to the particular act, and to understand the nature and consequence of such act, or knowing its wrongfulness. The defendant is not criminally responsible, if, by reason of insanity, she did not have the will and the mental power to refrain from the committing of such act; and in this regard you are further instructed that, if evidence is introduced tending to prove that the defendant was insane at the time of the commission of the act charged, then the burden of proving the sanity of the defendant devolves upon the prosecution, and the state is bound to establish her sanity like all other elements of the crime beyond a reasonable doubt. Therefore, if after a full consideration of all of the evidence in the case, you have a reasonable doubt that the defendant, at the time of the commission of the act charged, was mentally incompetent to distinguish between right and wrong, as applied to the act charged, or to understand the nature of the act she was committing, or knowing its wrongfulness, by reason of insanity she had not the will and mental power to refrain from committing such act, then and in that event it is your duty to acquit her.

"You are instructed that, if you believe from the evidence in this case that the defendant was suffering from insanity at the time of the commission of the homicide, or if a reasonable doubt is thereby raised of the defendant's sanity, it is your duty to resolve that doubt in favor of the defendant, and acquit her."

The giving of the foregoing instructions by the trial court on his own motion and the refusal to give the instructions requested form the basis of the main contention relied up by counsel for defendant as a ground for reversal of this judgment. To state succinctly this contention, it is as follows: The law of insanity in this state is governed by what is known as the new rule, which relieves a person of criminal responsibility if, at the time of the commission of the act, such person although able to distinguish between right and wrong as applied to the act itself is nevertheless excusable on the ground of insanity, if such person had not at the time the will power to refrain from committing the act.

Counsel for defendant admit that the Legislature may place reasonable safeguards around the defense of insanity, so long as the defense itself is not entirely abolished. This the Legislature of Oklahoma has done. The fourth subdivision of section 2094, Revised Laws 1910, defining those persons capable of committing crime, excepts the following:

"Fourth. Lunatics, insane persons, and all persons of unsound mind, including persons temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness."

The Supreme Court of the territory of Oklahoma in the case of *Maas v. Territory*, 10 Okla. 714, 63 Pac. 960, 53 L. R. A. 814, in construing the above statutory provision, held:

"One who has sufficient mental capacity to know the wrongfulness of an act which is by law declared to be a crime is responsible and subject to punishment therefor."

The holding in the *Maas Case* was subsequently approved by the territorial court in the case of *Turner v. Territory*, 15 Okla. 557, 82 Pac. 650.

Counsel for defendant contend, however, that the construction placed upon the foregoing statutory provision by the territorial Supreme Court is evidently incorrect, both from a legal and grammatical standpoint. In support of this contention, counsel assert that the clause, "upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness," only modifies that part of the section, "persons of unsound mind, including persons temporarily or partially deprived of reason," and has no relation whatever to "lunatics" or "insane persons." In other words, before a person of "unsound mind," who is "temporarily or partially deprived of reason," may be acquitted on the ground of such unsoundness of mind at the time of the commission of the alleged crime, such person must be incapable of knowing the wrongfulness of the act at the time of its commission, but entirely otherwise as to "lunatics" and "persons permanently insane."

Counsel for defendant, therefore, requests this court, in construing the above statutory provision, to apply a more stringent rule of proof to persons temporarily insane than to "lunatics" or "persons permanently insane." This we cannot do. It is apparent to our minds that the Legislature intended, as it had a right to, to attach criminal responsibility to all persons who are capable of knowing the wrongfulness of the act they are charged to have committed. The terms "lunatics" and "insane persons," incorporated in the above provision, clearly refer to those persons totally deprived of the power of reason, and who would not

under any circumstances have mental capacity sufficient to know the wrongfulness of the act. Such persons are relieved of criminal responsibility, and are distinguished from those of temporary or partial unsoundness of mind at the time of the commission of the act—that is, persons possessing a greater degree of mentality than "lunatics" or "persons permanently insane"; but certainly it cannot be with reason contended that the Legislature apprehended that there could be proof of a class of "lunatics" or "persons permanently insane" with sufficient power of reasoning and mental capacity to know the wrongfulness of the act and yet be excusable for its commission, while those only temporarily or partially insane would be required to offer proof to raise a reasonable doubt of their incapability of knowing the wrongfulness of the act. The Legislature intended to fix the same standard as to all persons designated in the statute; otherwise, great confusion would arise in the application of the law as to the defense of insanity, resulting in the miscarriage of justice, the conviction of persons "temporarily insane" under one standard, and the acquittal of "lunatics" and "insane persons" under the same standard. The statement of this proposition carries with it a sufficient denial of its tenableness.

In *Alberty v. State,* 10 Okla. Cr. 616, 140 Pac. 1025, 52 L. R. A. (N. S.) 248, in construing section 2094, *supra,* this court held:

"Under this provision, the test of criminal responsibility for committing an act which is declared to be a crime is fixed at the point where the accused has mental capacity to distinguish between right and wrong, as applied to the particular act, and to understand the nature and consequences of such act."

Again, in the case of *Smith v. State*, 12 Okla. Cr. 307, 155 Pac. 699, this court in another opinion, speaking through Doyle, P. J., held:

"The true test of criminal responsibility, where the defense of insanity is interposed, is whether the defendant had sufficient reason to know right from wrong."

To the same effect is the holding in *Owen v. State*, 13 Okla. Cr. 195, 163 Pac. 548.

These are the later opinions of this court construing the test of criminal responsibility as applied to all classes of persons alleged to have been insane at the time of the commission of the act, and if there is any apparent conflict between these decisions and the earlier decisions of this court upon the same subject, the later opinions are controlling, and must be held and construed to overrule the doctrine announced or the rule laid down to the contrary, if any, in *Adair v. State*, 6 Okla. Cr. 284, 118 Pac. 416, 44 L. R. A. (N. S.) 119.

Applying the test formulated by the Legislature in section 2094, *supra*, to the instructions given by the trial court in this case, we find no reversible error. Nor was it error for the trial court to refuse to give the instructions requested, for the reason that the law applicable to insanity was sufficiently covered in the instructions given and the instructions requested on this subject contained incorrect statements of the law.

An entire volume might be written on the law of insanity. Some states recognize and apply the doctrine of "irresistible impulse," otherwise sometimes called the "new rule." Other states follow strictly the English or old rule. The authorities on this subject, therefore, are in irreconcil-

able conflict. If the irresistible impulse doctrine is to apply in this state, then the Legislature must amend the statute. Until that time persons charged with crime, who interpose the defense of insanity, must be held criminally responsible for their acts if at the time of their commission they were capable of knowing the wrongfulness of their acts and to understand the nature and consequences of them. A person possessing such a degree of mentality cannot be held exempt from criminal responsibility in this state merely because of some alleged irresistible impulse on his part to do the act.

The statute of this state does not recognize the doctrine that one may be so possessed with an uncontrollable impulse as to compel him to do what he knows to be wrong and a crime, and yet be relieved from all criminal responsibility. A condition might be conceived of an uncontrollable insane impulse sufficient to relieve one of criminal responsibility under our statute; but this would only arise when the diseased condition of the accused's mind was such as to destroy the power of the accused to comprehend the nature and consequences of the particular act, and to know that it was wrong at the time of its commission.

It is next contended that counsel for the state made improper and prejudicial remarks during the closing argument. No objection was made to the remarks of counsel at the time the argument was made nor did counsel for defendant request the court to admonish the jury not to consider the same. In *Collins v. State,* 15 Okla. Cr. 96, 175 Pac. 124, it is held:

"Where certain remarks of the county attorney in argument to the jury are not such as are made grounds for reversal by statute, and there was no motion to exclude

such remarks from the consideration of the jury, nor any ruling of the trial court adverse to the defendant to which an exception was saved at the time, there is no question presented for this court to consider."

See, also, *Tucker v. State,* 9 Okla. Cr. 587, 132 Pac. 826; *Johnson v. State,* 5 Okla. Cr. 13, 113 Pac. 552; *Williams v. State,* 4 Okla. Cr. 523, 114 Pac. 1115.

The remarks complained of in this case were not such as are made grounds for reversal by statute. We find no question, therefore, presented under this assignment of error for the court to consider.

It is also contended that the trial court erred in permitting the brother of the deceased to testify concerning the value of a tract of land located in Alaska in which the deceased had a one-thirteenth interest at the time of the homicide. The gist of this contention is that the witness was permitted to express a legal conclusion that the deceased owned a one-thirteenth interest in said alleged estate, without any facts disclosing whether the deceased acquired this interest by devise or descent.

We have carefully examined the transcript of the evidence of the witness John Roe, brother of deceased, relating to this assignment of error, and we are convinced that the rulings of the trial court were not prejudicially erroneous to the defendant, when considered in connection with the various grounds of objection interposed to the questions. This evidence was undoubtedly admitted upon the theory that it tended to prove a motive on the part of the defendant in killing the deceased, and as the defendant interposed the defense that she did not commit the crime this evidence was clearly admissible upon the theory that there was a motive on her part for the killing. Coun-

sel have cited no authorities in the brief to support the contention that the admission of this evidence was erroneous. The objections urged are directed rather to the weight of the evidence than to its admissibility and no error is presented in this assignment sufficiently-prejudicial to authorize the reversal of the judgment.

Another alleged ground of error, relating to the refusal of the trial court to admit certain proffered evidence by one of the witnesses for the defendant, who was a trained nurse and had attended the defendant in connection with a physician some time in the year 1915, and had attempted to call one Charles Burton, a brother of the defendant, by telephone from Drumright to the residence of the said Charles Burton at Cushing, Okla., for the purpose of informing defendant's brother that she (witness) believed the defendant to be insane at that time and should be placed in an asylum, is urged as a ground for reversal.

This evidence was properly excluded. The witness, after having detailed certain acts and conduct of the defendant witnessed by her when nursing the defendant in 1915, was permitted to express the opinion that at that time the defendant was insane. The fact, if true, that said witness attempted to call up the brother of the defendant and inform him of her opinion that the defendant was insane was immaterial. She was permitted to express such an opinion to the jury, and no effort was made to show that the witness at any time had made any statement to any other persons outside of court contrary to the opinion expressed in court, and until such an attempt had been made on the part of the state the evidence offered was wholly immaterial.

Certain other alleged errors are presented for our consideration, but are not supported in the briefs filed by counsel representing defendant by the citation of authorities, and apparently are not considered as sufficient grounds to authorize a reversal of this judgment. A careful examination of the record in connection with these additional assignments of error convinces this court that such alleged errors are merely technical, and without substantial merit, and were not such as to deprive the defendant of any substantial right to her prejudice.

Counsel representing the defendant in this court has filed two able and lengthy briefs, fully covering the assignments of error chiefly relied upon for a reversal of this judgment. In addition to the briefs filed an extended, careful, and efficient oral argument was presented. The defendant was ably represented in the trial court, and her rights fully protected in every respect throughout the trial and in this court. However, after a careful consideration of the entire record, this court is clearly convinced that the defendant had a fair and impartial trial, and that her conviction is sustained by the evidence and the law.

It is therefore ordered and adjudged that the judgment of the district court of Pawnee county, that the defendant is guilty of the crime of murder and assessing the punishment at imprisonment in the state penitentiary for life, be and the same is hereby affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.