## E. S. WRIGHT v. STATE.

No. A-6946. Opinion Filed Dec. 7, 1929.
(283 Pac. 260.)

Garrett & Jeter and Guy Horton, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter referred to as the defendant, was tried upon an information charging him with murder, and found guilty of manslaughter, and his punishment fixed at five years in the penitentiary. Motion for new trial was filed, considered, and overruled, and exceptions saved, and the defendant has appealed his case to this court.

E. L. Wilson, called as a witness by the state, testified in substance:

"I lived at Fletcher, Oklahoma, on the 22d and 23d of March, 1927; I was living on the E. S. Wright place north of Duke, in this county; I was acquainted with Mart Nelson, and with E. S. Wright, this defendant; the Nelson farm parallels the Wright farm, a section line running between them; the Nelson home is a little better than a quarter of a mile from the corner of the highway."

Witness produced a plat of the land of the two parties showing where their homes were located. Witness further testified there was no obstruction between the Nelson and Wright places:

"The Nelson house is on a general rise, a little higher than the Wright place; there are no trees between the two houses, except some trees in the Nelson yard. Mr. Wright came home on the 22d day of March, 1927, about noon, with his stepfather, Mr. Barrett; I had some conversation with him; I don't know whether I talked to Mr. Barrett or not; Mr. Wright did not remain at home during the afternoon; he left about 1 or 1:30, and said he was going after a corn planter about six or seven miles south of Duke; Mr. Wright returned about 10 o'clock that night."

On cross-examination he explained why he and Mr. Barrett went to meet son and Mr. Wright that night, saying:

"I was uneasy about them being out with the team; my uneasiness had nothing to do with the Nelson trouble; Mr. Wright was selling his chickens and things preparatory to moving away from the place where he was living; I left the Wright place the next morning about a half to three-quarters of an hour after sunrise; I had no occasion to go to the barn to know anything about his team; all the stock that was on the place was Mr. Wright's."

Mrs. Jessie Nelson testified for the state, in substance:

"I am the widow of Mart Nelson; I live about fifteen miles southwest of Mangum, near the farm owned by Mr. Wright; our place was located on the northeast corner of the section; Mr. Wright's land is across the section line east of ours; our house was about a quarter of a mile south from the northeast corner of the land, a little west of the road running north and south; you can see our house from the Wright home, and from the Wright home you can see our place; it is in plain view only when the weeds are grown up; it is kindly rolling from our house south; my husband was forty-five years of age; we have four girls and three boys. The Jasper Nelson farm is a mile east from our place; my husband had been working this farm, going back and forth in a wagon; when I learned of my husband's death I went to where his body was, a quarter of a mile north and a mile and nearly a quarter west of our house, on the west road north of our home; my husband was dead before I got to where he was."

On cross-examination witness stated she had a suit pending against Mr. Wright, suing him for damages for killing her husband.

"When I got to where my husband was Joe Nelson was there; I could not say who else was there."

The evidence on behalf of the state further shows that the deceased was shot in the left side of the head; that his team ran the distance of about a mile before it stopped. An automobile, in which the defendant was riding, fol-

lowed the team the entire distance, and then circled around the wagon; the testimony tending to show that the defendant shot the deceased again. The testimony further shows that two witnesses who were traveling along this particular highway running east and west were stopped by the defendant, who was carrying a shotgun and which he pointed at them, and told them not to go any further west along the road, as he had shot a man down that way; that the body of the deceased was found about twelve feet from his wagon; the horses he was driving were hitched to a fence on the south side of the road, and one of the two horses that was following the wagon was still tied to the rear part of the wagon. This is in substance the testimony introduced on behalf of the state.

The defendant admits the killing; his defense is a combined defense of insanity and self-defense. Insanity superseded by brooding over the fact that the deceased had broken up his home, and self-defense on the assumption that, at the time the defendant shot the deceased, the deceased was making a move as if to assault the defendant with some kind of weapon which the defendant did not see. The defendant contends that he started out that morning to get a wagon sheet that he had left at a neighbor's place; that the neighbor lived about two and a half miles northwest of his house, and that in reaching the neighbor's place it was necessary to go on the road by the deceased's house; that he had had some trouble with the deceased, and had been informed that the deceased had threatened his life, and that on this morning the defendant took his shotgun and revolver with him for his necessary self-protection.

It is further contended by the defendant that, as he approached the wagon of the deceased, the driver of the car in which he was riding honked his horn for the de-

ceased, who was driving a wagon, to give them the right of way to pass. When they started to pass the wagon, the deceased looked around and saw the defendant in the automobile, and made a move as if to draw a gun; and thereupon the defendant jumped out of the automobile and shot the deceased. This shot caused the team to run away. He afterwards got in the automobile, but does not remember anything from that time on until the time of his arrest some three or four hours later.

On cross-examination the defendant testified that after the first shot was fired he does not remember what he did or what took place until his arrest several hours after the shooting. Other testimony was introduced by the defendant tending to show that he had brooded considerably over the fact that the deceased, Mart Nelson, had broken up his home and caused a separation between the defendant and his wife. The defendant also introduced some testimony to the effect that the deceased was carrying a gun, and, when asked why, said there was a certain man who was mad at him over a woman and had threatened to take his life.

There are many pages in the record that are immaterial to the issues in this case. We think reference has been made to all the testimony necessary or material to properly decide this case. It is admitted the defendant fired the shot that took the life of the deceased, Mart Nelson.

The defendant has assigned six errors alleged to have been committed by the trial court: First, the overruling of his motion for a new trial; second, error of the court in giving instruction No. 24; third, error of the court in giving instruction No. 31; fourth, error of the court in admitting incompetent evidence on the part of the state;

fifth, error of the court in refusing and ruling out competent and legal evidence of the defendant; and sixth, because the verdict and judgment is contrary to the law and the evidence. All of the errors assigned by the defendant in this case may properly be considered under the first assignment, as they all relate to the action of the court in overruling his motion for a new trial, which includes the instructions of the jury as to the law. The defendant contends that the court erred in giving instructions Nos. 24 and 31. The entire brief of counsel for the defendant is directed to the alleged error of the trial court in giving its instructions, which he contends are misleading and contradict each other to such an extent as to prejudice this defendant's right of self-defense.

It is urged by the defendant that the court erred in giving instruction No. 24, stating the circumstances under which the defendant would be guilty of manslaughter, and the court included within said instruction the exception, insanity, by reason of which the defendant could not have been guilty of said crime; that it was also incumbent upon the court to insert as a part of said paragraph the other exception of self-defense, which constituted one of the defenses interposed by the defendant in this case.

A careful study of instruction No. 24 discloses that the court was attempting to impress upon the jury that, although they may believe the killing to have occurred under such circumstances as to make the case one of murder or manslaughter, yet if the jury believed the defendant was insane they could not convict him. The main question in this case is the question of whether or not the defendant at the time he fired the fatal shot that took the life of the deceased was in danger of receiving great bodily harm or losing his life at the hands of the deceased. This question, we hold, was submitted to the jury in the in-

structions of the court. While they may not be as explicit as they should have been in one paragraph of the instructions, yet, taking the instructions in their entirety, the court correctly declared the law upon the question of defense, on insanity as well as upon the question of necessary self-defense. Under the evidence in this case there is not a sufficient showing on the question of the defendant's insanity, to the extent that he was unable to distinguish between right and wrong at the time of the commission of the offense, and we hold that under the evidence in this case that the court was unusually fair to the defendant in the giving of the instructions on the question that, if the jury found the defendant was insane at the time he fired the fatal shot, they should acquit him. There is no showing whatever on the question of the defendant's insanity; that he was unable to distinguish between right and wrong at the time he fired the fatal shot. McNeill v. State, 18 Okla. Cr. 1, 192 Pac. 256; Roe v. State, 17 Okla. Cr. 589, 191 P. 1048.

Upon the question of self-defense, the evidence is not contradicted that the defendant left his home with both a shotgun and revolver, and that, when he overtook the deceased on the highway, he voluntarily entered into this difficulty. A careful reading of his own testimony discloses that it was a difficulty that he was anticipating, and he had reason to believe would result in the use of deadly weapons.

The two defenses of the defendant, that is, insanity and self-defense, were fully covered by the court in his instructions. This court has repeatedly held that instructions to the jury should be considered together, and, if they embrace the law of the case, though one of them, when considered separately, does not clearly state the law, the conviction will not be reversed, unless it should appear

from the whole record that it was prejudicial to the rights of the defendant. Smith v. State, 14 Okla. Cr. 1, 166 Pac. 753; Brister v. State, 35 Okla. Cr. 319, 250 Pac. 442.

It has also been held by this court in several cases that, where the verdict clearly sustained the evidence, a new trial would not be granted for slight inaccuracies in instructions, if the general instructions, taken in their entirety, correctly stated the law. Colbert v. State, 4 Okla. Cr. 500, 113 Pac. 558; Johns v. State, 8 Okla. Cr. 585, 129 Pac. 451; McCarthy v. State, 21 Okla. Cr. 365, 207 Pac. 1069.

From a careful reading and study of the entire record in this case, we hold that the defendant was accorded a fair and impartial trial; that the evidence was sufficient to justify the court in submitting the case to the jury, and that the instructions of the court, considered together, correctly stated the law; that there were no fundamental or prejudicial errors committed.

The judgment is affirmed.

EDWARDS, P. J., concurs.

CHAPPELL, J., absent, not participating.