GEORGE W. HOGGATT v. STATE.

No. A-9303.   Sept. 22, 1939.
(94 P. 2d 264.)

378

H. Tom Kight and H. Tom Kight, Jr., both of Clare-more, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., for the State.

DOYLE, P. J. George W. Hoggatt was tried upon information filed in the district court of Rogers county October 22, 1935, charging him with the murder of one R. A. Maple, alleged to have been committed on the 14th day of September, 1935, by shooting him with a pistol.

It appears from the record that on October 20, 1936, both parties announced ready, and the defendant was placed on trial. On October 24, the jury returned a verdict finding him guilty as charged in the information and assessed his punishment at life imprisonment.

Judgment in accordance with the verdict was rendered November 13, 1936. The petition in error with case-made were filed in this court April 8, 1937, but there has been no appearance in his behalf on his appeal.

The assignments of error relate to rulings of the court on the admission and the exclusion of evidence and to instructions given by the court to the jury, and that the verdict is against the law and not supported by the evidence.

Upon arraignment the defendant entered a plea of not guilty. At the trial the defense interposed was in-

sanity; that the killing was excusable, because the defendant was insane at the time.

The theory of the prosecution was that the manner of this killing shows it was a willful, deliberate and premeditated murder.

The undisputed facts as established by the evidence are, that late in the evening, just after dark, on September 14, 1935, R. A. Maple was shot by the defendant, in the defendant's home in Claremore. At the same time the defendant shot Mrs. R. A. Maple. R. A. Maple was 63 years old at the time of his death; he was the father-in-law of the defendant, Mrs. Hoggatt, wife of the defendant, being the only child of her parents.

A. L. Mosgrave testified that he received an emergency call to the home of George Hoggatt; that he answered the call and found Mr. and Mrs. Maple in the Hoggatt house lying on the floor; Mr. Maple was dead; Mrs. Maple was wounded and unconscious; they were put in ambulances and taken to the Franklin Hospital. After an examination the body of Mr. Maple was taken to the funeral home and Mrs. Maple was left in the hospital. When found Mr. Maple was lying with his feet in the house and his head outside the screen door. Mrs. Maple lay just behind him. He found the wounds in the body ranged from the left side, one bullet entered the left arm and the left side, and there was one that entered just below and through this arm, then there was one that entered through the body and ranged up, and one bullet entered the top of the left shoulder and came out at eight inches below; there were bruises over his right eye and on his cheek, and there were two openings on his head, one right on top and one right behind it.

To the same effect was the testimony of John Musgrove, associated with A. L., his father, in the funeral home.

W. F. Hayes, M. D., testified that he was called to the Franklin Hospital about 8 o'clock that evening, and found Mrs. Maple on the operating table. Mr. Maple was dead. Later made an examination and found that he had been shot three times, and found several wounds on his head, looked like they were made with a blunt instrument; that the bullet wounds were sufficient to produce death, almost instantly.

Dr. B. F. Collins, M. D., testified that he made an examination of Mr. Maple's body at the undertaker's with Dr. Hayes. His description of the gunshot wounds and other injuries was in substance the same as that of Dr. Hayes. He further testified that he examined Mrs. Maple, found one gunshot wound just below the lobe of the right ear, another gunshot wound went straight through the muscles of the back, found 12 wounds that in his opinion were caused by bullets, and found her forehead beaten in and both frontal lobes of the brain ruptured and discharging bits of bone, which wounds were made with some blunt instrument.

The evidence on the part of the state tends to show the following facts:

That R. A. Maple was 63 years old, at the time of his death; that he came with his father to Beaver county where the family settled on a farm and was there engaged in farming and stock raising for 50 years.

Mrs. Pearl Maple testified:

"I live in Beaver county, I have lived there 50 years, I live eight or ten miles northeast of Beaver City; my husband's name was R. A. Maple, he was commonly known as Bob Maple; we were married in 1902, and lived on the place we homesteaded for four years before we moved to where I now live. We had two children, a boy and a girl; we lost our boy when he was three years old, my daughter's name is 'Nina', I have known the defendant, George Hoggart, nine or ten years. He came to

our place, I believe it was in 1926, and started working there, he continued to work until sometime in 1929. My daughter Nina was about 15 or 16 years old when he started to work for us; she and the defendant were married at Liberal, Kan., at the home of Dr. Trickle. My husband and I were there. They returned to our place and my husband and I went on to Colorado. They lived in our house for about a month, then they got their furniture and fixed up their house. The defendant and his wife moved away from our ranch in 1929, and moved to Claremore. On September 14, 1935, my husband and I came to Claremore on a visit to them. We got there about 10:30 in the morning; my daughter, the defendant and their two little boys were there, we brought their little girl with us; she had been staying with us; we were there for dinner that day; after my daughter and I washed the dishes, we gave the children a bath; my husband and the defendant went to a sale; when they came back we all got in our car and came down town and looked at some goods for the little girl; then we all went out to C. C. Hoggatt's home and stayed there about two hours; it was before sundown when we returned to Claremore. We had supper and prepared to stay all night; my husband, my daughter and her husband went up town; they were gone about three quarters of an hour; we sat down and visited a while and my husband said, 'I believe I will go out on the porch, it is cooler out there.' The defendant talked a little while, then got up and said something about there being such a bunch of crooks around there, that he had to keep things locked; he went over and locked a screen, and then sat down, and we were visiting and talking about the boys' suits; I was leaning over so I would not be between my husband and the defendant who were talking. The defendant said that Nina was going home with us. He had mentioned that before when we were going to Mr. Hoggatt's, that she was going home to stay with us a couple of weeks, that he had a government's job, and was going to be gone that length of time. He said he would go and get her suitcase, and he went in the other room; when he came back, I didn't pay much attention to him, and he came about four feet in the room and said: 'You and Bob, you have been trying to separate us every since we have been married, and here is something that is going to stop it right now.' I was looking right down in the barrel of a gun,

I started to say, 'George, you can't do that,' but I never said it. He went to shooting and I think he shot me first, but about that I can't be sure. I think he shot me right here (indicating); it just felt like a real hard lick with a hammer, and then flame and smoke and noise, not that I remember real clearly, but I think I fell over against Bob. I am not certain about this, but I believe that I grabbed him by the arm, and he turned around and fell, I turned around and fell with my head towards the door, and I could look out in the street; they had the street lights on, and everything was just as bright and clear, and he was beating Bob in the back of the head with the butt end of the gun, and he said, 'Here's one fellow nobody is going to get $4,000 a year to take care of.' It became difficult for me to breathe, then I lost consciousness."

The defendant, as a witness in his own behalf, testified:

"I was born in 1904, at Watonga, Blaine county, I lived there until when I was six or seven years old; my father and mother separated, and I went to live with my grandmother; she had a half section, about twelve miles from Beaver City; my sister, two years younger lived there with us, my grandmother was a widow, I lived with my grandmother until I was 17 or 18, then I left and worked mostly on cow ranches, I bought 160 acres when I was 20 years old, and rented it for a wheat farm, I went to school and I was in the Seventh or Eighth grade when I quit. I worked for John George on the T Bar T Ranch for a dollar a day. I stayed there four months. I didn't like it. We were good friends, but I was alone in the management, so I left and went to town. I saw Bob Maple and he hired me on the street, that was the 15th day of November, in 1926. I had a good horse and I rode out to his ranch that evening and went to work the next morning, feeding cattle, fixing fence, just ranch work. It was just a medium size ranch for that country. He had between 900 and 1,000 head, somewhere in that neighborhood, at that time. I stayed until the next November, and then until the next year, I think I had been there a month or six weeks when their daughter Nina came home from the Goodwell Agricultural School. I think she was past 15 or 16 at that time; she always spent

her summers at home. In 1927 we were married in Liberal, Kan., at Dr. Trickle's. Mr. and Mrs. Maple were there when we were married. They went on a trip to the mountains. My wife and I went back to the ranch, that was in July, 1928. One of the first things that happened between me and Mrs. Maple, she didn't want my wife to have any children until two years, and when she did become pregnant and told her mother, things were not sitting a bit good. My wife told me that Mrs. Maple kept insisting that she would not live with me any more. Bob Maple, through Mrs. Maple's instructions, had me put in jail in Beaver City. They claimed that I was insane. I stayed there I think two days and a half. I called my father at Tulsa from the jail. He came over. Mr. Maple made a proposition that if he would take me out of jail and keep me out, that he would release me, and Dad agreed to it. He came and told me about it, and told me it would be best for me to do that. I agreed to do that, except one thing, I asked Mr. Maple if he would object to me seeing my wife before I left. I had a Chevrolet coupe, brand new, my father went with me, to Mr. Maple's place to see my wife. We got there in the evening and stayed all night, I got to see my wife. She told me she had overheard her father and mother plan and scheme to throw me in jail. The next morning I asked Mr. Maple if I could see my wife, and I went upstairs to her room. She was already dressed and had the baby ready, and had her grip packed, and she took the baby in her arms and walked downstairs, Mr. Maple said: 'What does this mean?' And she never said a thing, she walked towards the door, and I was behind her with the grip. He said: 'Daughter, if you leave with that boy I don't want you to ever come back, I am going to disinherit you,' and she went out and got in my car and Dad followed after me, Mr. Maple called him back, and Dad told me what Mr. Maple told him; he said, "This is not according to our agreement,' and Dad says, 'The boy is of age' and 'The girl is of age,' they are both man and wife, and that is their child.' He says, 'Just between you and me I don't think there is anything I can do to them', he turned around, came out and got in the car and we left. We went to Beaver City, I drew out a little money I had there in the bank, and we went on to Tulsa, as straight as 64 would take us. With my wife and baby I lived in Tulsa possibly two months, then moved out on my uncle

C. C. Hoggatt's place, two miles from Catoosa, lived there around two months, then I bought a fifty acre farm, about a mile and a quarter south of Oologah and Claremore bridge on the Verdigris, and moved there September 14, 1929. We lived on this place four or five years. Mr. and Mrs. Maple came down and wanted us to go back, they came and visited three times the last two years. In May, 1934, we went back and lived in a little house on the place, we had all three of the children at that time, Mrs. Maple kept finding fault of the way my wife was keeping house, my wife found a brand new bottle of arsenic and she showed it to me. We stayed there about seven months. In January we moved away, they wanted to keep the little girl so they could get enough pupils to have this school, so that is how she came to stay. We went back to our little place out there and sold it in March following, then we moved to Claremore, the east part of town, I had a hard time getting a job, but finally got one, probably three weeks after we moved in here, we had this trouble."

The following excerpts from the defendant's testimony disclose his version of the tragedy:

"Q. When you got back then what did you do? A. I can't remember clearly. Seems like we got out of the car and got on the porch, and they went in, and seems like Mr. Maple and I sat on the porch swing. I am not sure. And then, we got up and went into the house. Q. When you got in there did you say anything? A. Yes, they were sitting there and my wife went into the bedroom, and she had her grip and those bundles, and she begin to untie those bundles, and put the clothes in the grip. Q. Now, George, after you saw the bags were being packed, and preparations were being made to go, then what happened? A. I don't remember anything clearly after that, I don't remember a thing. It is all just a dream. Q. Where were you when you did know what was going on? A. I was in jail. Q. Did you know anything about being out at C. C. Hoggatt's that night? A. I don't know anything. I don't recall it. Q. Did you call for me that night? A. I don't recall. Mr. Kight, Sr.: You may take the witness."

On cross-examination he stated that when he sold his farm he left Beaver county, having somewhere between

$7,000 and $8,000, the proceeds of the farm, cattle and wheat.

Asked how much money he had in the bank at the time of this tragedy, he answered: "Six or seven hundred dollars."

The defendant was the only witness who testified to any facts or circumstances which in any way tended to show that his wife's parents attempted or intended to separate him and his wife.

The defendant's wife was not called as a witness in his behalf.

Under the plea of not guilty counsel for the defendant introduced witnesses in an attempt to prove that at the time of the commission of the homicide, the defendant was insane.

Dave Falkner testified that he had been county commissioner, Rogers county, also sheriff for ten years up to January, 1935, saw the defendant often the past two years, had numerous conversations with him, that he often came to his house, and two days before the tragedy the defendant said they are going to be here in a few days, "they are going to do just as I have been telling you they were going to do."

"Q. What do you say as to his mental condition at that time, as to whether he was sane or insane? A. Why, I think he was sane when he was talking to me if he ever was. Q. You mean at each of those times? A. Yes, sir."

Several lay witnesses testified that from their acquaintance and conversations with the defendant about his family troubles, they considered him mentally unsound and insane on that subject.

Dr. G. W. Benson testified that he was jail physician and two or three days after the defendant was confined in jail he saw him; that he observed him probably more

especially than he did other prisoners in the jail, and in his opinion he was at that time insane, that he thinks he was suffering from delusional insanity, acquired, that he did not think he knew right from wrong when he lost control of consciousness and volition at that time.

Dr. J. C. Bushyhead testified that he has been practicing medicine in Claremore about forty-five years, knows the defendant and has been his family physician for about four years, and was present in the courtroom during the time he testified.

"Q. I wish you would tell the jury if, in your judgment, from all of your observations and opportunities that you have had to observe him, if you believe now that at the time of the commission of this crime that he was sane or insane? A. Well, I can't say, because I haven't seen George in a long time. Q. Do you believe now that he was in a condition mentally to determine right from wrong? A. I don't know. Q. What is your opinion, based upon the facts that you have given, as to his being rational or irrational at that time? A. Well, I just can't say. Q. What is your opinion, Doctor? A. Well, my opinion would be that he was irrational."

In rebuttal the state introduced lay witnesses giving as their opinion that the defendant was sane.

Oce Denbo testified that he was Rogers county jailer; that he saw the defendant the next day after the tragedy, observed his demeanor and conduct and had conversations with him nearly every day. Asked: "State to this jury as a layman whether in your opinion he was sane or insane." Answered: "I think he was sane."

A. M. Arnold, M. D., testified: "I live in Claremore; I have been a practicing physician for the past 47 years, I heard the defendant's testimony and I observed him closely. I believe he was sane."

W. D. Anderson, M. D., asked:

"Q. From your knowledge as a physician, and from your experience as a physician and examining cases,

either at Claremore or otherwise, and from all of the testimony that you have heard in this case, including the testimony of the defendant, both at the former trial and this trial, and the observation that you made of him, from the witness stand, tell the jury whether in your opinion at the time of the commission of this tragedy on September 14th, 1935, he was sane or insane, or whether he knew the difference between right and wrong? A. I think he was sane. I think he knew the difference between right and wrong at the time of the commission of the crime."

Mrs. Pearl Maple, recalled in rebuttal, testified:

"My daughter's first baby was born at the Ashland Hospital; my husband, her husband and myself were with her; I never did at any time tell the defendant that he could not come in to see his wife, I heard his testimony yesterday to the effect that in 1934, after they came back out to Beaver I asked him to go and be sterilized, I never at any time asked him to have a sterilization operation of any kind. I heard his testimony that I bought some arsenic. I did not at any time purchase any arsenic for any purpose; I heard his testimony that I said to him on the trip from C. C. Hoggatt's home that day that the marriage was a mistake from the beginning, and that I had come to take my daughter and the children. I never said that then, or at any other time."

The transcript of the testimony comprises 400 typewritten pages, but the foregoing is a substantial statement of the material evidence introduced in the case. While the defendant is not represented by counsel in this court, we have with much care examined the entire record, and we have been unable to find that the defendant has been deprived of a substantial right guaranteed to him under the law.

After a careful examination of the record and the exceptions taken to the rulings of the court on the admission and rejection of testimony, we are satisfied that, within well-settled rules sustained and upheld by the decisions of this court, no material error was committed by the court in any of its rulings.

Our Penal Code, Sec. 1797, 21 Okla. St. Ann. § 152, in part provides that:

"All persons are capable of committing crimes, except those belonging to the following classes:
* * *

"4. Lunatics, insane persons, and all persons of unsound mind, including persons temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness."

In the case of Alberty v. State, 10 Okla. Cr. 616, 140 P. 1025, 52 L.R.A., N.S., 248, this court held:

"That, under this provision, the test of criminal responsibility for committing an act which is declared to be a crime is fixed at the point where the accused has mental capacity to distinguish between right and wrong, as applied to the particular act, and to understand the nature and consequences of such act."

In the case of Adair v. State, 6 Okla. Cr. 284, 118 P. 416, 420, 44 L.R.A., N.S., 119, it is said:

"It is immaterial what standard scientists or medical experts may fix to determine, or by what rules they determine, that a person is in a state of insanity; the accused under this provision of the law is a lunatic, or insane, or of unsound mind, or temporarily or partially deprived of reason, to such an extent as will excuse him from criminal responsibility, only when he is incapable of knowing the wrongfulness of the act committed and charged, and incapable to understand the nature and consequences of such act, and this is a question of fact for the jury to determine under all the evidence in the case.
* * *

"Every defendant is presumed in law to be sane and capable of knowing right from wrong, and able to choose between them. This presumption, however, upon a trial for murder, is overcome whenever evidence is adduced sufficient to raise a reasonable doubt of the defendant's sanity at the time of the commission of the homicide. The law thereupon imposes upon the state the burden of establishing the sanity of the defendant the

same as any other material fact necessary to warrant a conviction; that is, beyond a reasonable doubt."

To the same effect is the holding in Smith v. State, 12 Okla. Cr. 307, 155 P. 699; Owen v. State, 13 Okla. Cr. 195, 163 P. 548; Reed v. State, 14 Okla. Cr. 651, 174 P. 800; Snodgrass v. State, 15 Okla. Cr. 117, 175 P. 129; Roe v. State, 17 Okla. Cr. 587, 191 P. 1048; McNeill v. State, 18 Okla. Cr. 1, 192 P. 256; Doublehead v. State, 27 Okla Cr. 375, 228 P. 170.

Where one is being tried for murder, and his defense is insanity, lunacy, or unsoundness of mind at the time of committing the act, the defendant, in the first instance, is presumed to be sane and of sound mind, and the burden is upon him to introduce sufficient evidence to raise a reasonable doubt as to his sanity. When he has done this, the state, before a conviction can be had, is required to prove his sanity beyond a reasonable doubt.

The trial court fully and fairly instructed the jury on the law of insanity, the only defense insisted on at the trial. The jury returned a verdict of guilty, necessarily finding the defendant to be sane. We think no honest and intelligent jury could arrive at a conclusion different from the guilt of the defendant of the crime of murder. There was no denial of the fact that he killed his father-in-law in the presence of his wife and her mother, and the evidence is such that it not only convinces this court that there was no question but that the defendant was sane at the time of the commission of the homicide, but also that the evidence introduced by him on the question of his sanity was insufficient even to overcome the legal presumption of sanity presumed to exist in all those charged with crime.

The evidence discloses a willful, deliberate, and in our opinion a premeditated, taking of human life, by a person who understood perfectly well the nature and con-

sequences of his act. Upon the whole record we are of the opinion that the defendant had a fair and impartial trial, with every right accorded to him that the law justifies or requires, and it would have been a miscarriage of justice, as we think, if upon the evidence any other verdict had been rendered.

The judgment of the district court of Rogers county herein is therefore affirmed.

BAREFOOT, J., concurs. DAVENPORT, J., not participating.